UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CALVIN MALONE, *et al.*,

                    Plaintiffs,

        v.

KEVIN W. QUIGLEY, *et al.*,

                    Defendants.

CASE NO. 3:14-cv-05974-RBL-JRC

REPORT AND RECOMMENDATION

NOTED FOR: May 29, 2020

This 42 U.S.C. § 1983 civil rights matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. §§ 636 (b)(1)(A) and (B) and Local Magistrate Judge Rules MJR 1, MJR 3, and MJR 4. This matter is before the Court on defendants' motion for summary judgment dismissal of plaintiffs' remaining claims against them. *See* Dkt. 191.

Plaintiffs are non-smokers involuntarily committed at the Special Commitment Center ("SCC"). They bring suit on the basis of exposure to environmental tobacco smoke ("ETS") at that facility. The Court previously granted defendants' motion for summary judgment dismissal

of plaintiffs' claims and following remand from the Ninth Circuit, defendants have renewed their motion.

With the benefit of counsel, plaintiffs have submitted additional evidence from which a trier of fact could find that (1) defendants acted unreasonably by failing to ban smoking at an earlier date; (2) where "any level" of ETS exposure is harmful, the pervasive exposure to ETS at SCC before the smoking ban created a substantial risk of harm; and (3) plaintiffs suffered from worsened asthma, allergies, and other conditions caused by the exposure. This evidence creates genuine issues of fact material to the analysis established by *Castro v. County of Los Angeles,* 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc) for testing the constitutionality of defendants' actions. And taking the facts in the light most favorable to the non-moving parties, defendants violated the right to be free from levels of secondhand smoke posing a substantial risk of harm— a right that was clearly established at the time. After reviewing the filings and hearing oral argument on April 24, 2020, the undersigned recommends granting in part and denying in part defendants' summary judgment motion and dismissing only claims for injunctive relief and for damages against officials in their official capacities.

## BACKGROUND

### I. Procedural History

Plaintiffs, acting *pro se*, filed this matter in December 2014, bringing claims against certain Washington State officials:  the DSHS secretary, Kevin Quigley; the DSHS assistant secretary, John Clayton; and various SCC officials and employees.[1]  *See* Dkt. 66, at 4–10.  In the

---

[1] In December 2015, the Court granted a defense motion to dismiss and dismissed all claims other than the ETS claims against defendants Kevin Quigley, John Clayton, Mark Strong, Leslie Sziebert, Cathi Harris, Crystal McCabe, Richard Steinbach, and Todd Dubble.  *See* Dkt. 91, at 1–2.  This summary focuses only on the surviving claims.

operative complaint (Dkt. 66), plaintiffs claim that defendants have violated the Eighth and

Fourteenth Amendments by ignoring their complaints about near-constant ETS exposure at SCC.

Dkt. 66, at 1–3, 30.  According to plaintiffs, due to tobacco use by staff and residents, rampant

indoor and outdoor smoking, and failure to enforce smoking rules, ETS permeated their living

units, common areas, and exercise yard.  *See* Dkt. 66, at 13–16.

In 2018, the Court adopted the undersigned's report and recommendation and granted a

summary judgment motion filed by defendants and denied plaintiffs' cross motion.  Dkt. 181; *see*

Dkt. 178.  Relying on Eighth Amendment principles by analogizing to conditions of confinement

for prisoners, the report and recommendation concluded that the exposure to ETS was similar to

cases in which exposure to tobacco smoke did not constitute cruel and unusual punishment

because there was no evidence that the exposure was unreasonable and because it did not violate

contemporary standards of decency.  *See* Dkt. 178, at 7–8, 10.  Moreover, even if plaintiffs had

been exposed to an unreasonable amount of ETS, they had not demonstrated that defendants

were deliberately indifferent to them under the objective-subjective test set forth in *Farmer v.*

*Brennan*, 511 U.S. 825, 837 (1994).  *See* Dkt. 178, at 10.

Plaintiffs appealed, and the Ninth Circuit vacated and remanded the matter, concluding

that "the district court analyzed the plaintiffs' Fourteenth Amendment claim under improper

Eighth Amendment standards[.]"  Dkt. 188, at 2.  The Ninth Circuit concluded—

> A pre-trial detainee bringing a Fourteenth Amendment conditions of confinement claim must show that the conditions under which that detainee was confined "put the plaintiff at substantial risk of suffering serious harm." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc).  The plaintiffs here are entitled to at least this level of protection.  Pre-commitment detainees are "entitled to protections at least as great as those afforded to [] civilly committed individual[s] and at least as great as those afforded to [] individual[s] accused but not convicted of a crime." *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004). . . .

1
2
3
4
5
6
7

Relying on a line of Eighth Amendment cases related to environmental tobacco smoke, including *Helling* [*v. McKinney*, 509 U.S. 25 (1993)], the district court here held that the plaintiffs' Fourteenth Amendment claim failed because the plaintiffs "have not demonstrated that they are being forced to endure an amount of ETS that violates contemporary standards of decency." But, as just explained, the "contemporary standards of decency standard" does not apply to the plaintiffs' claim. The applicable Fourteenth Amendment standard is more generous: A condition of confinement may not violate our contemporary standards of decency, yet still create a substantial risk of causing a plaintiff to suffer serious harm. *See Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982). Thus, the district court erred in applying the contemporary standards of decency standard to the plaintiffs' Fourteenth Amendment claim.

8

Dkt. 188, at 3–5.

9
10
11
12
13

Regarding the alternative analysis in the report and recommendation—that even if there was a sufficiently serious risk, there was no showing of deliberate indifference by defendants—the Ninth Circuit again disagreed and concluded that the Court "improperly imported Eighth Amendment jurisprudence into the Fourteenth Amendment context" by using *Farmer*'s subjective-objective test:

14
15
16
17
18

Although a plaintiff must establish under the Eighth Amendment that the defendant official demonstrated "a *subjective awareness* of the risk of harm," *Castro*, 833 F.3d at 1068[,] under the Fourteenth Amendment a pre-trial detainee need only prove that the official's conduct was "objectively unreasonable." *Id.* at 1071. That is, the pre-trial detainee must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* Again, the plaintiffs here at minimum were entitled to the level of protection afforded by the Fourteenth Amendment standard for pre-trial detainees. *Jones*, 393 F.3d at 932. So it was error to apply the less generous Eighth Amendment standard to the plaintiffs' claim. *See, e.g.*, *Gordon v. County of Orange*, 888 F.3d 1118, 1125 n.4 (9th Cir. 2018).

19

Dkt. 188, at 5–6 (some citations omitted).

20
21
22
23
24

The matter is now before the Court on defendants' second motion for summary judgment. *See* Dkt. 191. Defendants included no new evidence in support of their summary judgment, instead arguing that plaintiffs can provide no evidence from which a reasonable trier of fact could find in their favor. The Court appointed counsel to represent plaintiffs (*see* Dkt. 201), and

1   with the benefit of counsel, plaintiffs have filed their response—including voluminous

2   supporting evidence—and the matter is now ripe for decision.  Dkts. 214, 220.

3   **II.  Plaintiffs' Evidence**

4   Plaintiffs have substantially augmented the record before the Court since this matter was

5   before the Court on defendants' previous motion for summary judgment.  In opposition to

6   summary judgment, plaintiffs now supplement their declarations and the Surgeon General's

7   report about secondhand smoke with emails and documents from SCC staff and officials

8   regarding the SCC's actions.

9   **A.  Plaintiffs' Declarations**

10   Each plaintiff has provided a declaration describing conditions at the SCC, as early as

11   2004.  *See* Dkt. 219, at 1; *see also* Dkts. 216–18.  According to plaintiffs, SCC staff used

12   cigarettes as an incentive system for residents, bribing them with tobacco for compliance and

13   reprimanding by taking away tobacco for misconduct.  Dkt. 217, at 3.  Plaintiffs state that they

14   have medical conditions either irritated or brought on by the ETS at SCC, including plaintiff

15   Perkins' and Mitchells' allergies to cigarette smoke (Dkt. 217, at 3; Dkt. 219, at 2), plaintiff

16   Kent's asthma—which required an inhaler while he was at the SCC (Dkt. 218, at 3), and plaintiff

17   Malone's chronic cough.  Dkt. 216, at 8.

18   According to plaintiffs, until 2016, smoking was allowed at SCC in so-called "fresh air

19   pads" in certain residential buildings—"covered fully enclosed spaces" adjacent to each living

20   unit with one, chain-link fenced side—and throughout the yard.  *See* Dkt. 218, at 1–2.  During

21   this time, defendant Malone states that ETS exposure was unavoidable, with ETS blowing into

22   the units when fresh air pad doors were opened, circulating throughout ventilation systems, and

23   wafting in from smoking in the yard.  Dkt. 216, at 2.

24

1    In 2016, SCC officials banned smoking on the fresh air pads and limited it to designated

2    outdoor areas during certain times.  Dkt. 219, at 3.  However, ETS exposure persisted, since

3    "everyone started smoking inside" and security staff did not enforce the new smoking policy.

4    Dkt. 219, at 4.  Plaintiff Mitchell states that he documented nearly 250 separate incidents of ETS

5    coming into living spaces through the ventilation system, including smoke so thick that he

6    believed his room was on fire.  Dkt. 219, at 5.  He states that violations of the policy by residents

7    was "primarily due to lack of enforcement because of a shortage of staff to patrol all the zone[s]

8    in the community yard area."  Dkt. 219, at 7.  Staff also flouted the new policy.  Dkt. 216, at 4.

9    Finally, in 2017, the SCC banned smoking altogether—although plaintiff Mitchell states

10   that there is at least some contraband tobacco still present at SCC.  Dkt. 219, at 7; *see also* Dkt.

11   175, at 2.

12   **B.  Surgeon General's Report and SCC Records**

13   According to the 2006 Surgeon General's report that plaintiffs rely on,[2] in 1972, the U.S.

14   Surgeon General's office for the first time issued a report warning the public of the health risk of

15   then-prevalent secondhand smoke exposure.  *See* Dkt. 213-1, at 592.  In 1992, in response to an

16   Environmental Protection Agency report stating that secondhand smoke killed thousands

17   annually, enactment of local clean air ordinances began to accelerate.  Dkt. 213-1, at 596.

18   By 2000, there was little debate within the scientific community as to whether

19   secondhand smoke causes diseases and other adverse health effects in children and adults.  *See*

20   Dkt. 213-1, at 596.  In 2006, when the Surgeon General announced that there were "no" safe

21   levels of ETS exposure, approximately 31% of the U.S. population was subject to some form of

22   comprehensive smoke-free law.  Dkt. 213-1, at 596, 601–02.  This included Washington State

23

24   [2] As discussed below (*infra*, Discussion, part II), the Court takes judicial notice of the report.

where, in 2005, the "Clean Indoor Air Act" was passed, making it illegal to smoke in all indoor workplaces and public places in the state.  Dkt. 213-1, at 595; *see also* ch. 70.160 RCW.  Just a few years earlier, in 2004, the Washington State Department of Corrections had entirely banned smoking in its prisons.  *See* Dkt. 213-1, at 649.

In contrast to the increasing prevalence of restrictions on indoor smoking, plaintiffs provide evidence from as early as 2010 that secondhand smoke was so prevalent inside the buildings that SCC that employees and residents complained of their exposure.  Employees reported "almost constant[]" exposure to secondhand smoke in one of the SCC living units, from the fresh air pad.  Dkt. 215-25, at 2; *see also* Dkt. 215-8, at 2; Dkt. 215-28, at 2.  The Pierce County Health Department had even inspected the areas, noting concern about the location of "fresh air pads" where residents smoked in residential housing buildings.  Dkt. 215-8, at 2.  Designated smoking areas on the fresh air pads were not large enough for multiple residents, leading to residents smoking near the door to the building.  *See* Dkt. 215-26, at 3.  As early as 2012, staff also expressed concern about other staff smoking near buildings.  Dkt. 215-26, at 2.

In 2013, SCC officials documented three primary areas of concern:  smoke drifting from resident fresh air pads into buildings, staff buses, and smoking in the yard area by residents and staff.  Dkt. 215-12, at 3.  SCC staff attempted to resolve the issues by modifying residential fresh air pads, including relocating smoking areas and installing fans and seals, sending a memo to staff about smoking away from buildings, and increasing signage for designated smoking areas.  *See* Dkt. 215-9, at 4; Dkt. 215-12, at 3.  However, even after installation of the pads, staff continued to complain about secondhand smoke drifting into some buildings, and employees continued to smoke within 25 feet of buildings.  Dkt. 215-29, at 3; Dkt. 215-12, at 2.  Indeed in late 2013, an employee resigned his position on the safety committee due to staff not taking

concerns including secondhand smoke exposure "seriously." Dkt. 215-30, at 3–4. In response, SCC officials noted that officials, including defendant Strong, were considering whether to ban smoking on the "fresh air pads" entirely and a plan for improving designated outdoor smoking areas. Dkt. 215-30, at 2.

Problems persisted throughout 2014 and 2015, when employees noted that smoke from at least one fresh air pad continued to drift into buildings, where staff had to "constantly smell and inhale the smoke." Dkt. 215-1, at 2. An employee complained of a "horrific" smell in one of the units, where smoke continued to seep into the building from the fresh air pad, and that she had developed asthma and two bouts of pneumonia since beginning work at the SCC. Dkt. 215-4, at 3. Plaintiff Malone wrote a grievance stating that he was exposed to ETS on a daily basis, that all the fresh-air pad smoking areas were located too close to the buildings, and that smoke "incessantly filter[ed]" into housing and dayrooms and permeated the yard. Dkt. 215-20, at 2; *see also* Dkt. 215-41, at 3 ("The smoke coming from the fresh air pad has gotten really bad lately."); Dkt. 215-43, at 2 ("Many staff ha[ve] brought to my attention that they are not happy including me, having to sit [i]n the unit between 8 and 16 hours of breathing in second hand smoke. . . . it has been going on for years."); Dkt. 215-44, at 5. Another employee reiterated that the secondhand smoke issues had been going on for "years" and that defendant Clayton had not wanted to ban smoking since it was one of the "few perks to these residents." Dkt. 215-2, at 3. In response, defendant Strong stated that he was considering options such as banning tobacco for employees, allowing smoking only in the courtyard, or potentially seeking legislating banning tobacco on the island altogether. Dkt. 215-2, at 2.

Although SCC officials, including defendants Strong and Hauck[3], discussed changing the policy to forbid smoking on the fresh air pads, the SCC did not ban smoking in fresh air pads until January 2016.  As early as September 2014, defendant Hauck had drafted a letter banning smoking on the fresh air pads entirely.  Dkt. 215-4, at 2.  In October 2014, defendant Strong had begun rewriting the applicable policy but sought feedback about continuing to allow smoking in a shelter at one of the three residential buildings.  Dkt. 215-5, at 4.  In August 2015, the proposed policy had been redrafted, but was under review by the Attorney General's office and labor attorneys.  Dkt. 215-42, at 3; *see also* Dkt. 214-47, at 2 (noting that further action was "stalled due to litigation.").

The January 2016 policy change forbade smoking in the fresh air pads and required smoking in designated locations in the courtyard.  Dkt. 215-6, at 2; *see also* Dkt. 215-16, at 3.  Violations of the new policy continued to occur.  Complaints occurred after the policy change of residents smoking in their rooms, causing ETS to permeate living units through the ventilation systems.  *See* Dkt. 215-15, at 2; Dkt. 215-23, at 2.  Employees continued to smoke near entrances.  Dkt. 215-7, at 2.  Finally in 2017, officials banned smoking entirely at the SCC.  Dkt. 175, at 2.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate where the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In making this determination, the Court must view the evidence in the light most

---

[3] Defendant Hauck is also referred to at certain points in the record as defendant "McCabe."  *See* Dkt. 214, at 14 n.1.

1   favorable to the nonmoving party.  *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).  The materiality

2   of a given fact is determined by the required elements of the substantive law under which the

3   claims are brought.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Factual disputes

4   that do not affect the outcome of the suit under the governing law will not be considered.  *Id.*

5       Once the moving party has carried its burden under Fed. R. Civ. P. 56, the party opposing

6   the motion must do more than simply show that there is some metaphysical doubt as to the

7   material facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  The

8   opposing party cannot rest solely on his or her pleadings but must produce significant, probative

9   evidence in the form of affidavits, and/or admissible discovery material that would allow a

10  reasonable jury to find in his favor.  *Id.* at n.11; *Anderson*, 477 U.S. at 249–50.  However,

11  weighing of evidence and drawing legitimate inferences from facts are jury functions, and not

12  the function of the court.  *See United Steel Workers of Am. v. Phelps Dodge Corps.*, 865 F.2d

13  1539, 1542 (9th Cir. 1989).  Moreover, the Court may grant summary judgment as a matter of

14  law when the nonmoving party fails to make a sufficient showing on an essential element of a

15  claim in the case on which the nonmoving party has the burden of proof.  *See Celotex Corp. v.*

16  *Catrett*, 477 U.S. 317, 323 (1986).

17  **II.  Request for Judicial Notice**

18      As a preliminary matter, the undersigned briefly addresses plaintiffs' request for judicial

19  notice of the Surgeon General's report about the dangers of exposure to ETS.  *See* Dkt. 214, at

20  33.  Defendants' objections to the Court taking judicial notice of the report are substantive

21  arguments that the report fails to establish the prongs set forth by the Ninth Circuit's decision in

22  *Castro v. County of Los Angeles*.  *See* Dkt. 213; Dkt. 220, at 7–8.  These arguments concern the

23  relevance of the report, but not whether the Court should take judicial notice of the report.

24

1    Statements within this report meet the requirements for judicial notice in Federal Rule of

2    Civil Procedure 201:  the statements are capable of accurate and ready "determination by resort

3    to a source whose accuracy cannot reasonably be disputed."  *Accord Fisher v. Caruso*, No. 03-

4    CV-71804-DT, 2006 WL 2711807, at *12 & n.20 (E.D. Mich. 2006).  The Court takes judicial

5    notice of the report.

6    **III.  *Castro v. County of Los Angeles* Prongs**

7    **A.  *Castro v. County of Los Angeles* Standard**

8    When evaluating whether plaintiffs' exposure to ETS violated their Fourteenth

9    Amendment right to due process, the Ninth Circuit made clear that plaintiffs must show that the

10    conditions under which they were confined "'put the plaintiff at substantial risk of suffering

11    serious harm."  *Castro*, 833 F.3d at 1071.  The parties do not dispute that plaintiffs must

12    establish each of the four prongs set forth in *Castro* to prevail:

13    (1)  The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

14    (2)  Those conditions put the plaintiff at substantial risk of suffering serious harm;

15    (3)  The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved;

16    (4)  By not taking such measures, the defendant caused the plaintiff's injuries.

17    *Id.*; *see* Dkt. 188, at 3–4; Dkt. 191, at 10–11; Dkt. 214, at 25.  "With respect to the third element,

18    the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[] on

19    the facts and circumstances of each particular case.'"  *Id.* (quoting *Kingsley v. Hendrickson*, 576

20    U.S. 389, 135 S. Ct. 2466, 2473 (2015)) (internal citation omitted).  This test requires something

21    "more than negligence but less than subjective intent—something akin to reckless disregard."

22    *Id.*

23

24

REPORT AND RECOMMENDATION - 11

1    Defendants' summary judgment briefing contains no argument that plaintiffs' showing

2    regarding the first prong is inadequate.  The undersigned therefore begins with defendants'

3    arguments regarding the second prong.

4    **B.  Substantial Risk of Suffering Serious Harm (Second *Castro* Prong)**

5    Defendants argue that plaintiffs have not provided any evidence that they were exposed

6    to a substantial risk of serious harm.  Dkt. 191, at 11.  To the contrary, plaintiffs have provided

7    ample evidence that, viewed in the light most favorable to them, supports that ETS permeated

8    the SCC until 2017, that they were regularly exposed to ETS, that ETS was present in the yard,

9    housing, and dayrooms, and that efforts to mitigate ETS at the facility before November 2017

10   were ineffective.

11   This includes employee complaints that during employee shifts, they were exposed to

12   "almost constant[]" ETS in residential buildings (*see* Dkt. 215-25, at 2), including after the 2014

13   fresh-air pad smoking ban.  *See* Dkt. 215-1, at 2; Dkt. 215-4, at 3.  It is a reasonable inference

14   that residents' exposure would be at least as great as that of the staff.  Plaintiffs' evidence also

15   includes plaintiffs' statements, such as plaintiff Malone's complaint of "incessant[]" ETS.  Dkt.

16   215-20, at 2; *see also* Dkt. 215-41, at 3 ("There appeared to be a little relief when the HVAC

17   system was turned on but now the smoke appears to be back."); Dkt. 215-43, at 2 ("Many staff

18   ha[ve] brought to my attention that they are not happy including me, having to sit [i]n the unit

19   between 8 and 16 hours of breathing in second hand smoke."); Dkt. 215-44, at 5 ("We are sitting

20   at the desk inhaling a lot of smoke for 8 to 16 hour shifts."); Dkt. 215-15, at 2 ("I have been

21   receiving a number of reports that residents are smoking in their rooms."); Dkt. 215-23, at 2

22   ("my cell fills with smoke daily from residents in their cells smoking during lockdown times.").

23

24

1    Defendants make much of the undersigned's previous finding that there was no evidence

2    of ETS so pervasive that the amount of exposure was unreasonable.  *See, e.g.*, Dkt. 181, at 1.

3    However, the Ninth Circuit vacated the prior Order, so that it is not binding as the law of the

4    case.  *See United States v. Houser*, 804 F.2d 565, 567 (9th Cir. 1986).  Moreover, with the

5    benefit of counsel, plaintiffs have provided additional evidence of the presence of ETS at SCC—

6    much of which was not previously presented to the Court and which supports plaintiffs'

7    arguments that they were exposed to significant levels of ETS at the SCC for years.

8    Plaintiffs also rely on the Surgeon General's report, which includes a number of

9    statements supporting the risks posed by exposure to ETS.  *See, e.g.*, Dkt. 213-1, at 5 ("Inhaling

10   secondhand smoke causes lung cancer and coronary heart disease in nonsmoking adults."), 8

11   ("[S]econdhand smoke exposures produce substantial and immediate effects on the

12   cardiovascular system . . . ."), 31 ("The scientific evidence indicates that there is no risk-free

13   level of exposure to secondhand smoke.").  Defendants argue that the report provides mere

14   general background information and because it is not specific to plaintiffs, it cannot be relied on

15   to show that the levels of smoke that they were allegedly exposed to posed a significant risk of

16   harm.  *See* Dkt. 191, at 11.  However, it is a reasonable inference from the Surgeon General's

17   report that if even a small dose of secondhand smoke would result in a risk of harm, then such a

18   large and long duration of exposure would carry a great risk of harm.  *Accord Hicks v. Corrs.*

19   *Corp. of Am.*, No. CV 08-0687-A, 2009 WL 2969768, at *6 (W.D. La. Sept. 11, 2009) (finding

20   that evidence that a prisoner was exposed to almost 24 hours per day of secondhand smoke met

21   the even more rigorous standard under the Eighth Amendment, in light of the Surgeon General's

22   report).  Defendants' reliance on *Crago v. Schriro*, an unpublished, nonbinding District of

23   Arizona case that appears to have been discussing a different document, is not persuasive.  *See*

24

1    No. CV 08-0355-TUC-FRZ, 2010 WL 11534484, at *9 (D. Ariz. June 23, 2010)), *aff'd,* 453 F.

2    App'x 732 (9th Cir. 2011).

3        Plaintiffs have come forward with evidence from which a trier of fact could reasonably

4    conclude that their exposure to ETS posed a substantial risk of serious harm to them.

5        ### C.  Failure to Take Reasonably Available Measures (Third *Castro* Prong)

6        The third *Castro* prong is whether a defendant took or failed to take "reasonable available

7    measures to abate that risk, even though a reasonable officer in the circumstances would have

8    appreciated the high degree of risk involved[.]"  833 F.3d at 1071.  Here, the latter part of the

9    test—that a reasonable officer would have appreciated the high degree of risk involved—is

10   readily apparent, taking plaintiffs' submissions as true.  Plaintiffs' evidence includes statements

11   by employees of the SCC that ETS exposure levels were unacceptable.

12       The focus of defendants' arguments is on whether plaintiffs have shown that the actions

13   that defendants took—in lieu of banning smoking entirely—were objectively unreasonable,

14   given the facts and circumstances.  *See* Dkt. 191, at 12.  Defendants assert that they took many

15   actions leading up to banning smoking entirely.  In December 2013, they responded to the three

16   primary sources of secondhand smoke by (1) installing fans and door and window seals in fresh

17   air pads and relocating designated areas within the pads, (2) relocating staff bus drop-off areas (a

18   source of smoke), and (3) designating three areas in the TCF yard as designated smoking areas,

19   with increased signage.  Dkt. 215-12, at 3.  In May 2014, they reminded employees that failure to

20   comply with state law about smoking could result in disciplinary action, including termination.

21   Dkt. 215-1, at 3.  In January 2016, they changed SCC policy to forbid smoking in the fresh air

22   pads.  Dkt. 215-6, at 2.  And eventually, in November 2017, they banned smoking altogether.

23   Dkt. 219, at 7.

24

1    However, plaintiffs argue that defendants' actions were objectively unreasonable.

2    Although defendants claimed that they acted as quickly as possible but that it took time to obtain

3    stakeholders' approval, plaintiffs provide evidence that complaints about ETS had been going on

4    for years before 2014, including as early as 2010.  Dkt. 215-25, at 2.   In 2013, an employee

5    resigned from the SCC safety committee, citing continued inaction in the face of complaints

6    about ETS at the SCC as one of the reasons.  Dkt. 215-30, at 3–4.  Plaintiffs assert that

7    defendants used tobacco to incentivize good behavior (*see* Dkt. 217, at 3) and that in 2014, an

8    employee stated that issues with ETS had been a problem for "years" but that SCC officials did

9    not want to ban smoking because "smoking is one of the few perks to these residents."  Dkt. 215-

10   2, at 3.  In October 2014, defendant Hauck wrote to defendant Strong opposing the continued

11   presence of tobacco at SCC and expressing her concerns that allowing smoking at all at SCC as a

12   "reward" for residents was contradictory to SCC officials' claimed concern for resident health.

13   Dkt. 215-5, at 2.  This is evidence that supports plaintiffs' allegations and from which a trier of

14   fact could conclude that defendants acted objectively unreasonably.

15   It is typically a jury's role to evaluate the "reasonableness" of a person's conduct.  *See*

16   *Sloman v. Tadlock*, 21 F.3d 1462, 1468 (9th Cir. 1994)).  If there is any doubt about whether

17   conduct was objectively reasonable, reasonableness cannot be decided on summary judgment.

18   Questions of reasonableness may be decided as a matter of law only where the facts leave no

19   room for doubt.  *See Evanston Ins. Co. v. OEA, Inc.*, 566 F.3d 915, 920 (9th Cir. 2009).

20   Here, where there is evidence from which a reasonable trier of fact could conclude that it

21   was objectively unreasonable for defendants not to earlier ban smoking at SCC, the Court should

22   not grant summary judgment on the basis of the third *Castro* prong.

23   **D.  Causation (Fourth *Castro* Prong) and Damages**

24

1    The fourth *Castro* prong is whether defendants' inaction caused plaintiffs' injuries.

2    Defendants argue that expert testimony is necessary to resolve this issue in plaintiffs'

3    favor. *See* Dkt. 191, at 17–18. Defendants focus on the Surgeon General's report—largely

4    omitting from their briefing discussion of plaintiffs' declarations that substantiate that they have

5    already suffered from injuries caused by exposure to ETS at the SCC. These declarations about

6    the harm that they suffered are competent evidence of harm based on plaintiffs' individual

7    situations and create triable issues of fact regarding causation. Plaintiff Kent states that he

8    suffered asthma requiring an inhaler from the time that he arrived at SCC to the time that

9    smoking was banned. Dkt. 218, at 3. Plaintiff Malone states that he suffers a chronic cough that

10   began at the SCC and continues to this day. Dkt. 216, at 8. Plaintiffs Mitchell and Perkins state

11   that they are allergic to cigarette smoke and suffered various symptoms, including headaches,

12   trouble breathing, sore throats, eye irritation, nausea, and sinus irritation. Dkt. 219, at 2; Dkt.

13   217, at 2.

14   Contrary to defendants' arguments, expert testimony is not required in every § 1983

15   action alleging deliberate indifference or medical claims. *See* Vikram Iyengar, *The Relevance of*

16   *Expert Testimony to Claims of Deliberate Indifference under the Eighth Amendment*, 52 No. 1

17   Crim. Law Bulletin ART 4 (cataloguing cases). Defendants' reliance on medical malpractice

18   cases is inapposite: unlike § 1983 matters, state law requires medical malpractice claims to be

19   substantiated through expert testimony in all but the most obvious cases. *E.g. Young v. Key*

20   *Pharmaceuticals, Inc.*, 112 Wn.2d 216, 228 (1989).

21   Defendants point to the District of Arizona's unpublished ruling in *Crago*, finding

22   that a deliberate indifference claim for exposure to ETS in prison failed for reasons including a

23   lack of expert testimony tying plaintiff's complaints of health issues to his exposure to ETS. *See*

24

1   *Crago*, 2010 WL 11534484, at *8.  *Crago*'s reliance on Arizona State law about the evidentiary

2   requirements for proving causation in cases involving medical negligence is not persuasive.  The

3   sole federal case that *Crago* cites for support regarding this issue discusses state, not federal law.

4   *See Hutchinson*, 838 F.2d at 392 ("The issue here is whether under *California state law* Ms.

5   Hutchinson was required to submit expert opinions on the medical standard of care in order to

6   defeat the defendants' motion for summary judgment." (Emphasis added.)).  But in federal court,

7   expert testimony is required on issues such as causation only if special expertise is necessary for

8   a jury to make a causal inference.  *See Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 504 (9th

9   Cir. 1994).

10          A § 1983 plaintiff may offer his own testimony establishing an obvious causal link

11  between the act and his alleged injury.  *See, e.g.*, *Haflich v. McLeod*, No. CV 09-161-M-DWM-

12  JCL, 2011 WL 71435, at *3 (D. Mont. Jan. 10, 2011) (§ 1983 plaintiff's own testimony about

13  physical pain and shortness of breath he felt when tased was sufficient and expert testimony was

14  not required to establish causation); *Baca v. State of California*, No. C 13-02968 SBA, 2016 WL

15  234399 (N.D. Cal. Jan. 20, 2016) (§ 1983 plaintiff could testify about pain and injuries resulting

16  from alleged beating and if his testimony went to areas properly covered by expert testimony,

17  defendant could object at trial).  Defendants fail entirely to address such cases allowing lay

18  testimony about causation under § 1983, instead focusing on inapposite cases about state law

19  claims.

20          Defendants also argue that there is no competent evidence from which the jury could

21  determine the amount of damages.  Dkt. 220, at 11.  However, "the law does not require expert

22  testimony to establish damages." *DSPT Intern., Inc. v. Nahum*, 624 F.3d 1213, 1223 (9th Cir.

23  2010).  This is not the type of case where plaintiffs improperly seek compensation based merely

24

1    on the fact that their constitutional rights were violated in the abstract. *See Sloman v. Tadlock*,

2    21 F.3d 1462, 1472 (9th Cir. 1994) (damages not available on an abstract basis). Rather, it is

3    within a jury's lay expertise to fix an amount of damages that would compensate plaintiffs for

4    the symptoms that they claim that they suffered and, for some of them, continue to suffer.

5        Defendants also argue, based on unpublished, non-binding authority, that plaintiffs'

6    injuries are *de minimus* injuries that cannot, as a matter of law, afford them relief. *See* Dkt. 220,

7    at 9. Their arguments are not persuasive. The Ninth Circuit has held that the claim of a person

8    who has heightened sensitivity to cigarette smoke is not "wholly insubstantial" in a § 1983

9    matter. *See Franklin v. State of Or.*, 662 F.2d 1337, 1347 (9th Cir. 1981) (plaintiff placed in a

10   cell with a heavy smoker that allegedly aggravated his throat condition), *cited in Jones v. Bayer*,

11   56 Fed. App'x 408, 409 (9th Cir. 2003); *see also Alvarado v. Litscher*, 267 F.3d 648, 653 (7th

12   Cir. 2001) (evidence of chronic, severe asthma worsened by ETS exposure violated Eighth

13   Amendment).

14       For these reasons, plaintiffs have provided adequate evidence on the challenged *Castro*

15   prongs to defeat defendants' summary judgment motion.

16       **IV. Qualified Immunity Analysis**

17       Defendants alternatively argue that their summary judgment motion should be granted on

18   qualified immunity grounds. *See* Dkt. 191, at 13, 16. Contrary to defendants' arguments,

19   however, the law is clearly established that there is a right to be free from exposure to significant

20   levels of secondhand smoke. *See Helling v. McKinney*, 509 U.S. 25 (1993). And, viewed in the

21   light most favorable to plaintiffs, a jury could reasonably find that defendants violated this right.

22   The Court should reject defendants' arguments that the change in the applicable standard

23

24

1 announced by *Castro* affects the "clearly established law" analysis and should not grant the

2 summary judgment motion on the basis of qualified immunity.

3            **A.  Qualified Immunity Principles**

4         Qualified immunity shields government officials from liability for civil damages unless

5 their actions violate clearly established statutory or constitutional rights of which a reasonable

6 person would have known.  *See Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 599 (9th

7 Cir. 2019).  A court will find that qualified immunity applies where there was no constitutional

8 violation or where the right violated was not "clearly established" at the time of the alleged

9 violation.  *See Horton*, 915 F.3d at 599.  A right is clearly established if "every reasonable

10 official would have understood that what [the official] is doing violates that right."  *Id.* (internal

11 quotation omitted).  This inquiry must be undertaken in light of the specific context of the case

12 and not as a broad general proposition.  *Id.* (internal citation omitted).  The qualified immunity

13 inquiry is objective:  what would a reasonable official have understood the law to be at the time?

14 *See id.*

15         A defendant may raise the defense of qualified immunity at multiple stages in a

16 proceeding, including in a motion for summary judgment dismissal.  *Behrens v. Pelletier*, 516

17 U.S. 299, 306 (1996).  The Supreme Court has explained that unless qualified immunity is

18 allowed to be raised as a defense before trial, its protections are improperly vitiated.  *Id.* at 308.

19         Depending on the stage of the proceedings in which a defendant raises qualified

20 immunity, the inquiry for the Court differs somewhat.  Where, as here, qualified immunity is

21 raised in a summary judgment motion, the Court inquires whether "the evidence before it (in the

22 light most favorable to plaintiff)" meets the qualified immunity prongs.  *Id.* at 309.  The Supreme

23

24

1    Court has observed that "successful pretrial assertions of immunity seem to be a rare

2    occurrence." *Id.* at 310.

3        Here, granting the summary judgment motion on the basis of qualified immunity would

4    be appropriate only if the facts taken in the light most favorable to plaintiffs do not violate a

5    clearly established right. *See id.* at 313 ("[T]he District Court's denial of petitioner's summary

6    judgment motion necessarily determined that certain conduct attributed to [defendant] (which

7    was controverted) constituted a violation of clearly established law. . . ."); *see also Scott v.*

8    *Harris*, 550 U.S. 372, 378 (2007) (a court must construe the facts in the light most favorable to

9    plaintiff and then ask if, under these facts, the officer is entitled to qualified immunity as a matter

10   of law).

11                    **B.. Defendants' *Castro* Argument**

12       The question often presented is how to define the right that must be "clearly established."

13   Defendants assert that Ninth Circuit's holding in *Castro* changed the law, therefore the right was

14   not clearly established. *See* Dkt. 191, at 13. But defendants are confusing a constitutional right

15   with the standard for determining a violation of that right. The "right" at issue in this case is the

16   right to be free from exposure to significant levels of secondhand smoke, as set forth in *Helling*

17   *v. McKinney*, 509 U.S. 25 (1993). The standard for proving whether or not that right has been

18   violated was changed by *Castro*—but not the right, itself.

19                    **1. From *Farmer* to *Castro***

20       As defendants point out, the *Castro* decision announced a shift in the standard applicable

21   to civil detainees who were attempting to prove deliberate indifference by defendants. In

22   *Farmer v. Brennan*, in 1994, the Supreme Court first defined "deliberate indifference" in the

23   Eighth Amendment context. 511 U.S. at 835, 837–38. The Court explained that in order to

24

1  prove "deliberate indifference," a plaintiff must present evidence that encompasses both

2  objective and subjective prongs.  *See id.* at 838 ("[A]n official's failure to alleviate a significant

3  risk that he should have perceived *but did not*, while no cause for commendation, cannot under

4  our cases be condemned as the infliction of punishment." (Emphasis added)).

5          Between *Farmer* and *Castro*, the Ninth Circuit applied this Eighth Amendment

6  "objective-subjective" standard to prove pretrial detainees' claims.  *See Clouthier v. Cty. of*

7  *Contra Costa*, 591 F.3d 1232, 1245 (9th Cir. 2010) (citing *Farmer*, 511 U.S. 825), *overruled by*

8  *Castro*, 833 F.3d 1060.

9          In 2015, the Supreme Court decided *Kingsley v. Hendrickson*, holding that the Fourteenth

10  Amendment's standard for proving a defendant's state of mind was purely objective,

11  encompassing no subjective component.  135 S. Ct. at 2475.  The Court explained that its

12  precedent interpreting the due process clause did not require proof of an officials' subjective

13  beliefs about a policy, but objective evidence about conditions and their relationship to a

14  legitimate government purpose.  *Id.* at 2473.

15          In 2016, the Ninth Circuit decided *Castro*, holding that *Kingsley* "cast . . . into serious

16  doubt" *Clouthier*'s application of the Eighth Amendment, subjective-objective method of

17  proving a defendant's actions under the Fourteenth Amendment.  833 F.3d at 1069.  The Ninth

18  Circuit held that claimed violation of a pretrial detainee's due process right to be free from

19  violence at the hands of other inmates was to be proven under *Kingsley*'s purely objective

20  standard.  *Castro*, 833 F.3d at 1069.  The Ninth Circuit has since extended this standard of proof

21  to claims of pretrial detainees for inadequate medical care.  *See Gordon v. Cty. of Orange*, 888

22  F.3d 1118, 1124 (9th Cir. 2018)).  Again, in *Gordon*, the right to be protected was the right to

23

24

1   adequate medical care; the way to prove a violation of that right was by using a purely objective

2   standard.  *See id.* at 1124.

3                      **2.  Effect on the Qualified Immunity Analysis**

4         In *Castro* itself—the very case announcing the change that defendants argue requires

5   application of qualified immunity—the Ninth Circuit held that qualified immunity did not apply.

6   Despite holding that a new standard of proof applied, the Ninth Circuit conducted the qualified

7   immunity inquiry by looking to the "contours of the right," which it defined as "a due process

8   right to be free from violence from other inmates."  833 F.3d at 1067.  The Court of Appeals

9   looked to *Farmer* itself, which the Court defined as "ma[king] clear that 'prison officials have a

10  duty to protect prisoners from violence at the hands of other prisoners.'"  *Id.* (quoting *Farmer*,

11  511 U.S. at 833).[4]

12        Moreover in *Horton by Horton v. City of Santa Maria*, decided after *Castro*, the Ninth

13  Circuit discussed the change in the standard of proof at length.  *See* 915 F.3d at 602.  There, the

14  Ninth Circuit recognized that "[t]his objective standard would therefore guide our analysis of

15  whether a constitutional violation occurred . . . were we to reach that question."  *Id.*  Again,

16  however, the Ninth Circuit largely ignored the change in the law when conducting the qualified

17  immunity analysis.  Instead of simply holding that the change in the standard meant that the law

18  was not clearly established (as defendants argue the Court should do here), the Court looked to

19  whether case law about the underlying right—"when a detainee's imminent risk of suicide was

20  substantial enough to require immediate attention"—was clearly established at the time of the

21

22  ───────────────
    [4] This, despite that appellants in *Castro* made the precise qualified immunity argument in
    supplemental briefing to the appellate court that defendants advance here.  *See* Dkt. 47, at 9 n.3

23  ("Any change in the standards to establish deliberate indifference against the defendants would
    warrant a new trial or the entry of judgment as the individual defendants would be entitled to

24  qualified immunity, as the law was not clearly established at the time of the incident.").

1    alleged violation. *Id.* at 600. The Court determined that the appropriate inquiry was whether

2    "given the available case law at the time of [plaintiff's] attempted suicide, a reasonable officer,

3    knowing what [the defendant knew], would have understood that ailing to check on [plaintiff]

4    immediately after the phone call . . . presented such a substantial risk of harm . . . that the failure

5    to act was unconstitutional." *Id.* Again, none of this analysis turns on the change in the

6    applicable proof standard announced by *Castro*.

7         Defendants also rely on an unpublished case in which the Ninth Circuit concluded that

8    qualified immunity applied when there had been an intervening change in the law of deadly

9    force: the definition of deadly force was expanded to include actions with a substantial risk of

10   harm. *See Smith v. City of Hemet*, 394 F.3d 689, 705 (9th Cir. 2005) (overruling *Vera Cruz v.*

11   *City of Escondido*, 139 F.3d 659, 663 (9th Cir. 1998) (as amended)). This analysis is not

12   persuasive. The shift in the definition of what types of actions constituted "deadly" force is not

13   the same as a change in the law about what standard of proof applies to officials' state of mind.

14   As plaintiffs point out, the change announced by *Smith* was a change in the contours of the right

15   itself: new types of force were prohibited. In contrast here, the change is in the standard of

16   proof for evaluating an official's state of mind.

17              **C.  Properly Defined Clearly Established Right**

18        The undersigned turns to the parties' dispute over how to properly define the substantive

19   right at issue.

20        It is a plaintiff's burden to establish that a right allegedly violated was clearly established

21   at the time of the violation. *See Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). A clearly

22   established right is one that was settled law because of either controlling authority or a robust

23   consensus of persuasive authority. *District of Columbia v. Wesby*, __ U.S. __, 138 S. Ct. 577,

24

1  589–90 (2018).  Whether or not a constitutional right is "clearly established" is a question of law

2  for a judge to decide.  *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017).

3      "A clearly established right is one that is 'sufficiently clear that every reasonable official

4  would have understood that what he is doing violates that right.'"  *Mullenix v. Luna*, 136 S. Ct.

5  305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  Although there need

6  not be a case directly on point, "'existing precedent must have placed the . . . constitutional

7  question beyond debate.'"  *Mullenix*, 136 S. Ct. at 308 (quoting *Ashcroft v. al-Kidd*, 563 U.S.

8  731, 741 (2011)).

9      Here, defendants characterize the right at issue as a right to be free from *constant*

10  exposure, arguing that "[n]o appellate court in the nation prior to 2015 has substantiated an ETS

11  claim on the sort of intermittent exposure described by this Court."  Dkt. 191, at 16.  However,

12  defendants overlook that there is at least some evidence that viewed in the light most favorable to

13  plaintiffs establishes that ETS exposure was pervasive, not merely sporadic or intermittent.  *See*

14  Dkt. 214, at 16 ("Nothing short of pervasive exposure has previously been recognized to

15  potentially substantiate a constitutional violation.").  As defendants acknowledge, the type of

16  inescapable exposure that plaintiffs allege has been clearly established as a constitutional

17  violation.  Dkt. 214, at 16.

18      Even accepting defendants' framing of the evidence as supporting at most, intermittent

19  exposure, there is a clearly established right to be free from exposure to significant levels of

20  secondhand smoke.  Since the Supreme Court's decision in *Helling* in 1994, there was been a

21  clearly established right to be free from exposure to ETS that posed a serious risk of harm to

22  future health.  *See* 509 U.S. at 33–35; *see also Alvarado v. Litscher*, 267 F.3d 648, 653 (7th Cir.

23  2001) ("Given the decision in *Helling*, the right of a prisoner to not be subjected to a serious risk

24

of his future health resulting from ETS was clearly established in 1998–99."); *Mills v. Clark*, 229

F.3d 1143 (4th Cir. 2000) ("Therefore, *Helling* establishes a constitutional right to be free from a

level of environmental tobacco smoke so high that is poses an unreasonable risk of serious

damage to future health[.]"); *Warren v. Keane*, 196 F.3d 330, 333 (2d Cir. 1999) ("We hold that

after *Helling* it was clearly established that prison officials could violate the Eighth Amendment

through deliberate indifference to an inmate's exposure to levels of ETS that posed an

unreasonable risk of future harm to the inmate's health.").  As noted above, plaintiffs have

provided their own declarations and voluminous additional evidence about the amount of ETS

they were exposed to and the duration of their exposure, as well as the Surgeon General's report

that any level of exposure is harmful—evidence that taken together, supports that they were

exposed to levels of ETS posing a serious risk to their health.

    Further, since the Supreme Court's decision in *Estelle v. Gamble*, 429 U.S. 97, in 1976

there has been a clearly established right to be free from present harm caused by exposure to

ETS.  *See Weaver v. Clarke*, 45 F.3d 1253, 1256 (8th Cir. 1995) (where ETS was the catalyst for

plaintiff's existing health problems, such a claim had been clearly established since the *Estelle*

decision; *see also Atkinson v. Taylor*, 316 F.3d 257, 266–68 (3d Cir. 2003)).  Moreover, since at

least 1991, the Ninth Circuit has clearly established that there is a right to be free from harm

caused by placing one with a condition that is irritated by secondhand smoke in close proximity

with a smoker.  *Johnson v. Moore*, 948 F.2d 517, 522 n.3. (1991); *see also Franklin*, 662 F.2d at

1346–47; *McKinney v. Anderson*, 924 F.2d 1500, 1504 (9th Cir.), *vacated and remanded sub*

*nom. Helling v. McKinney*, 502 U.S. 903 (1991), *reinstated*, 959 F.2d 853 (9th Cir.1992), *aff'd*

*and remanded sub nom. Helling v. McKinney*, 113 S. Ct. 247, *remanded on remand*, 5 F.3d 365

(9th Cir.1993).

Nor does the fact that plaintiffs were detainees and *Helling* involved a prisoner change the outcome. Courts have routinely applied *Helling*'s clearly established right to circumstances involving detainees. *See, e.g.*, *Rahman v. Schriro*, 22 F. Supp. 3d 305, 316 (S.D.N.Y. 2014) (applying *Helling* to risk of future harm from cancer-causing hazard by pretrial detainee). This follows logically from the state of the law at the time, that civilly detained persons were entitled to *at least* the rights afford to prisoners. *See Hyrdick v. Hunter*, 500 F.3d 978, 989 (9th Cir. 2007), *vacated on other grounds by* 556 U.S. 1256 (2009).

For these reasons, the Court should reject defendants' qualified immunity arguments.

**V. Injunctive Relief and Remaining Claims**

Defendants request summary judgment dismissal of plaintiffs' claims against officials in their official capacities for damages and of their claims for injunctive relief. Regarding claims for injunctive relief, plaintiffs no longer have standing to bring such claims, since smoking has been banned at SCC. *See City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983).

Further, claims against officials for damages are barred except to the extent that they are against officials in their individual capacities. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Therefore, the Court should grant the summary judgment motion to the extent that it seeks dismissal with prejudice of claims against officials in their official capacities for damages and claims for injunctive relief.

**CONCLUSION**

For the reasons set forth above, the Court recommends denying the summary judgment motion (Dkt. 191), except that plaintiffs' claims for injunctive relief and for damages against defendants in their official capacities should be dismissed with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge (*see* 28 U.S.C. § 636(b)(1)(C)) and can result in a result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **May 29, 2020,** as noted in the caption.

Dated 8th day of May, 2020.

J. Richard Creatura
United States Magistrate Judge